[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs, Philip and Charlotte Sullivan, filed an application for a prejudgment remedy against the defendants, Mary Anne Delisa and Kathryn Highland, Trustees of the Mary E. Crowell Revocable Trust, and Mary E. Crowell, Settlor of the Mary E. Crowell Revocable Trust. The plaintiffs alleged that there is probable cause to believe that a judgment in the amount of $231,251.00, taking into account any known defenses, counterclaims or set offs, will be rendered in their favor on the underlying eight-count complaint.
After a hearing, a review of the evidence presented, and an assessment of the credibility of the witnesses, the court finds the following facts: The plaintiffs, Philip and Charlotte Sullivan, were mated in 1969. Philip Sullivan is the son of Mary Crowell and brother of Mary Anne Delisa and Kathryn Highland. In 1970, the plaintiffs were dispossessed of their residence. Philip's sister Mary Anne persuaded their mother, Mary Crowell, to allow the plaintiffs to move into the house located at 37 Valley View Drive, Farmington, Connecticut [hereafter `the house']. The mother expected the plaintiffs to stay until they found a place of their own. Thirty years later they found an apartment of their own in Newington, Connecticut. No one, including the plaintiffs, expected that they would stay that long.
The plaintiffs asserted that they had a rental agreement, which had been negotiated by Philip's sister Mary Anne Delisa, where they would pay $160.00 per month at $80.00 every two weeks and split the cost of the oil. The defendants denied the existence of any rental agreement.
In 1970, when the plaintiffs moved in, the mother allowed them to use her bedroom because it had a bathroom attached and afforded a little privacy. The mother moved into one of the smaller bedrooms. The plaintiffs did not have exclusive possession of any area of the house including their bedroom. Other members of the house could enter their bedroom and at times even used the bathroom there. The plaintiffs had the use of the entire house, shared meals and joined in the entertainment of family guests.
The plaintiffs submitted copies of some checks,[1] cash withdrawal receipts,[2] and a payment ledger[3] to help support their claim of a rental agreement. The documents covered a very short time period during the claimed thirty year lease agreement. Instead of twenty-four checks for each of the thirty years, the plaintiffs submitted the following: two checks for 1988; seven checks for 1989; two checks for 1996; four checks for 1997; eleven checks for 1998; one check for 1999 and two checks for 2000. The limited number of checks, the dates and amounts of the checks and some of the notations on the `memo' portion support a conclusion that CT Page 1297-df the amounts were contributions toward the household expenses, rather than a rental agreement to pay $160.00 per month, paid at $80.00 every two weeks for thirty years.
The plaintiffs also submitted nine cash withdrawal slips for 1998. Again, the notations on the slips do not lead to a conclusion of payment in accordance with the claimed rental agreement. Also, the ledger submitted by the plaintiffs covered a period from December 18, 1998 to September 2000. Mary Crowell denied making any entries on the ledger. She did admit that some of the initials were hers, but she did not believe that she had initialed all of the entries.
Between 1982 and 1987, the plaintiffs performed work they described as maintenance, repairs and improvements to the house. Some of the work included removal and replacement of siding, shingles, windows, a water tank, the furnace, and landscaping. The plaintiffs did about 90 percent of the work. All of the work was initiated by the plaintiffs and was never requested by the defendants. Mary Crowell, Philip's mother, paid for all of the materials for the maintenance, repairs, and improvements to the house.
Philip Sullivan claimed to have performed the work because he "expected to have the house." Article 5(A)(1) of the Mary E. Crowell Family Home Trust[4] provided for the sale of the house upon the termination of life use by Mary Crowell. The amendment to the trust[5] changed the designation of the beneficiaries in Article V. However, all other terms remained in effect, including the revocation of all other wills and codicils.
The plaintiffs never submitted a bill nor requested payment for any labor or services performed during 1982 to 1987. The first time Philip informed his mother that he was seeking reimbursement was by letter dated July 14, 2000.[6] He also informed her that he would continue to pay rent in the form of an offset or credit against the amount he believed that she owed him. Philip also expressed some displeasure at the difficulty that he was having in finding a place to live. He believed the problem could have been avoided if only his mother had informed him of her plans to move to a "luxury retirement apartment." The plaintiffs did acknowledge that they would have to move. They just did not believe that they had been given a reasonable amount of time in which to move.
Philip Sullivan was his mother's financial advisor and had prepared some trust documents for her. Mary Crowell, by checks dated December 30, 1992 and January 21, 1993, gave $20,000.00 to Philip Sullivan. By checks dated December 16, 1992 and January 21, 1993, Mary Crowell gave $20,000.00 to Charlotte Sullivan. Philip Sullivan distributed $80,000.00 CT Page 1297-dg from the trust fund to his wife Charlotte Sullivan. The plaintiffs received a total of $120,000.00. Philip Sullivan was removed as trustee in September 2000.
On June 27, 2000, and again on July 11, 2000, Mary Anne Delisa informed the plaintiffs that the house was up for sale and they would have to find a place of their own. On July 13, 2000, and again on July 20, 2000, Mary Crowell informed the plaintiffs, by leaving a message on their answering machine, that they would have to move. The plaintiffs received the messages as Philip mentioned them in his letters of July 14, 2000[7]
and July 30, 2000.[8] Mary Crowell by letter dated July 31, 2000,[9]
again notified the plaintiffs that they had to move, and to remove their belongings by August 6, 2000. She also informed the plaintiffs that the electricity would be shut off, that the locks would be changed by August 6, 2000. Since there had not been any response to the previous notices, she assumed that their belongings would be removed. In that letter, Mary Crowell also informed Philip Sullivan that she had hired an attorney who had amended the trusts and prepared a new will. Mary Crowell moved to a retirement apartment on July 6, 2000.
On July 6 or 7, 2000, Philip Sullivan had an argument with his sister Mary Anne Delisa. He claimed that his sister had accused his wife, Charlotte, of abusing their mother, Mary Crowell. During the argument, Philip informed his sister that he would no longer cooperate, that he would not look for a place to move to, and that they would have to evict him. There was also some discussion about the possibility of Philip purchasing the house. It is unclear when those discussions broke down. Philip also tried to convince his sister that selling the house was illegal. No testimony was presented as to why the sale would be illegal.
After the argument, the plaintiffs took some of their personal belongings and left the house. Philip Sullivan went to the hospital complaining of stress and stayed overnight. His wife Charlotte spent the night at the hospital with him. The plaintiffs then stayed at Charlotte's father's house. After that, they stayed in a motel for a few days. From there they went to Rhode Island and stayed at the family cottage. While at the cottage in Rhode Island, the plaintiffs arranged for the rental of a two bedroom apartment in Newington, Connecticut. The rental agreement was for a term of one year starting August 1, 2000, a monthly rental amount of $700.00, and a security deposit.
In his letter dated July 30, 2000,[10] Philip notified his mother that it was impossible to move by August 6, 2000, and that she should not touch any of his belongings. He also asked her to notify any new tenant that they had use of the entire house except for the two front bedrooms, that they intended to reoccupy the house, and that they would not agree CT Page 1297-dh to move unless the mother agreed to pay their cost for moving and storage and their monthly rent, less $160.00, for a period of one year.
The plaintiffs had not been living at the house since July 6 or 7, 2000. However, on July 11, and July 29, 2000, the plaintiffs returned to the house. All of their property was in the same condition in which they had left it. Sometime in late August the plaintiffs went to the house and saw a "For Sale" sign. They returned to the house on September 7, 2000 and discovered that their keys no longer fit the locks. This should not have been a surprise since the plaintiffs had been previously notified that the locks would be changed after August 6, 2000. In September 2000, the plaintiffs `found out' that their personal property had been placed in the garage, the back porch and the den. At the time of the hearing the property was still there.
The plaintiffs had been to the house several times between July 2000 and the date of the hearing. During those visits, the plaintiffs never made any attempt to remove their property or to examine it for any damage. They chose to leave the property at the house.
Philip Sullivan owned a bulldozer, which he kept on the property for fifteen years. The neighbors had offered to purchase it for $8,000.00. The plaintiff last saw the bulldozer in the backyard in August 2000. Mary Crowell denied having any knowledge of the whereabouts of the bulldozer. No evidence was presented to show that any of the defendants had taken the bulldozer or had it in their possession.
 DISCUSSION
"A `prejudgment remedy' is any remedy that enables a person by way of attachment . . . to deprive a defendant in a civil action of or affect the use, possession . . . by such defendant of his property prior to final judgment." Fermont Division v. Smith, 178 Conn. 393, 398, 423 A.2d 80
(1970). Quoting Conn. General Statutes § 52-278a (d).
Conn. General Statutes 52-279d (a)(4) provides that "if the court upon consideration of the facts before it and taking into account any defenses, counterclaims or set offs, claiming exemption and claims of inadequate insurance, finds that the plaintiff has shown probable cause that such a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought, and finds that a prejudgment remedy securing the payment should be granted, the prejudgment remedy applied for shall be granted as requested or as modified by the court."
In determining whether to grant an application for a prejudgment CT Page 1297-di remedy, "the . . . court determines whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits. . . . The court determines the probable success by weighing probabilities as to both the legal and factual issues." Statev. Stevens, 26 Conn. App. 804, 805 [citations omitted], citing Bank ofBoston Connecticut v. Schlesinger, 220 Conn. 152, 156, 595 A.2d 872
(1991).
COUNT ONE — ENTRY AND DETAINER
The plaintiffs have alleged the following: 1. An oral month to month lease started on September 1, 1970, and on or about September 7, 2000, the defendants or their agents changed the locks to the house; 2. The defendants or their agents removed the plaintiffs' possessions which were in the house, and the plaintiffs would have to commit a breach of peace in order to regain possession and; 3. The plaintiffs, as a result, have suffered humiliation, deprivation of their possessions, homelessness and other injury in violation of Conn. Statutes 47a-43, et seq.
Conn. General Statutes 47a-1 (d) defines a landlord as an owner, lessor or sublessor . . . Conn. General Statutes 47a-1 (L) defines a tenant as a lessee, sublessee entitled under a rental agreement to occupy a dwelling unit or premises, to the exclusion of others or otherwise defined by law. Conn. General Statutes 47a-1 (i) defines a rental agreement as all agreements, written or oral . . . embodying the terms and conditions concerning the use and occupancy of a dwelling unit or premises. Conn. General Statutes 47a-43 et seq. provides the statutory framework for `entry and detainer' in a landlord tenant relationship. The plaintiffs claim that the defendants violated Conn. General Statutes 47a-43 when they changed the locks to the house.
The plaintiffs have alleged the existence of a month-to-month lease agreement with a monthly rental payment in the amount of $160.00 paid at $80.00 every two weeks and a little more as their share for the cost of oil. Philip Sullivan stated that when they moved in in 1970, he proposed that they would be tenants. The mother neither asked them to be nor agreed that they were tenants. Philip also stated that any payments they made were voluntary. The plaintiffs had the entire use of the house and shared meals with his mother and siblings. They also joined in the entertainment of family guests. The plaintiffs did not have exclusive use of any part of the house including their bedroom and bathroom. The mother, Mary Crowell, retained control of the house pursuant to Article IV of the Trust.[11] She and her daughter Mary Anne had informed the plaintiffs that the house would be sold. They told the plaintiffs that they would have to find a place of their own and remove their personal property. CT Page 1297-dj
The plaintiffs left the house on July 6 or 7, 2000 and stayed at a number of places, including the cottage in Rhode Island. While at the cottage, they arranged for the rental of their own two bedroom apartment, effective August 1, 2000. The plaintiffs went into the house at least twice in July and "went by" sometime in August 2000. In September, they "found out" that the locks had been changed. The plaintiffs had been informed in July that the locks would be changed by August 6, 2000. The property had been placed in the garage, the den and the porch. They have had many opportunities to inspect and remove their property and chose not to do so. The opportunity still exists. The plaintiffs have not been deprived of their possessions.
The plaintiffs have emphasized that they were never served with a notice to quit. Although Mary Crowell could have resorted to use of summary process to have the plaintiffs removed on the grounds that their right or privilege to occupy no longer existed, she was not required to do so.
The court finds that there is not probable cause to believe that the plaintiffs would prevail on a claim of violation of Conn. General Statutes47a-43.
COUNT TWO — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
The plaintiffs have incorporated by reference, paragraphs 1 through 6 of Count One and further alleged the following: 1. That on July 7, 2000, the defendants or their agents, confronted the plaintiffs at the premises and engaged in such outrageous and extreme behavior, including harassment, threats, and salacious claims that they were forced to seek shelter at a relative's home for reasons of their health and safety; 2. The plaintiffs had a month-to-month lease, had legal possession of the premises, continued to tender payment of rent which has been acknowledged and not refused; 3. The conduct caused plaintiffs to suffer severe emotional distress, including sleeplessness, hospitalization and Post-traumatic Stress Syndrome which required medication; 4. Conduct constitutes intentional infliction of emotional distress.
In order to establish a cause of action for intentional infliction of emotional distress, a plaintiff must show the following: 1. That the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; 2. That the conduct was extreme and outrageous; 3. That the defendant's conduct was the cause of the plaintiffs distress and 4. That the emotional distress sustained by the plaintiff was severe (internal quotation marks omitted.) Appleton v. Board of Education of Stonington. CT Page 1297-dk254 Conn. 205. 210, 757 A.2d 1059 (2001).
"Extreme and outrageous conduct is an essential element in the tort of intentional infliction of emotional distress." Brown v. Ellis,40 Conn. Sup. 165, 167, 484 A.2d 944 (1984). "Liability has been found only where the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."Appleton v. Board of Education of Stonington, supra 210-211. On July 7, 2000, the defendant Mary Ann Delisa informed the plaintiffs that the house would be sold and that the plaintiffs would have to find a place of their own. The plaintiffs did leave, but did not take their personal property. They also discussed the possibility of buying the house. The defendant, Mary Crowell, Philip Sullivan's mother, informed the plaintiffs that they would have to leave, first by leaving messages on the plaintiffs' answering machine on July 13, 2000 and on July 20, 2000, and by letter dated July 31, 2000.
The plaintiffs responded by letter, dated July 14, 2000, and July 30, 2000, expressing difficulty in finding a place to live because of inadequate notice of the mother's move to a "luxury retirement apartment." The plaintiffs also expressed continuance of payment of "rent" in the form of an offset by monies they believed owed to them by the plaintiff Mary Crowell, his mother. The plaintiff, Philip Sullivan, also outlined the following conditions under which he would agree to move sooner than a "reasonable and adequate time period requires": 1. An agreement for Mary Crowell, his mother, to pay his complete cost of moving and storage and, 2. Payment of the monthly rent of a new apartment, less $160.00, for one year.
The evidence presented established that there was an argument between Philip Sullivan and Mary Ann Delisa. The plaintiffs took some belongings and left the house. The plaintiff, Philip Sullivan, on his own, went to the emergency room of a local hospital and was kept overnight for observation. The plaintiffs then stayed at Mary Sullivan's father's house before moving on to a motel, then to the family cottage and then to their own apartment. They arranged the rental agreement for the apartment while at the cottage in Rhode Island.
No evidence was presented on harassment, threats or salacious claims. The conduct of the defendants was not extreme and outrageous, an essential element in the tort of intentional infliction of emotional distress. The court finds that the plaintiffs have not shown probable cause that there was an intentional infliction of emotional distress.
COUNT THREE — WHEN LANDLORD MAY ENTER RENTED UNIT
CT Page 1297-dl
Paragraphs #1-6 were incorporated by reference, and the plaintiffs further alleged a violation of Conn. General Statutes 47a-16. The statute states the circumstances under which a landlord may enter a rented unit. Conn. General Statutes 47a-1 (d)(1) and (i) define landlord, tenant and rental agreement respectively.
Mary Crowell owns the house and lived there until July 6, 2000, when she moved to a retirement apartment. Philip and Charlotte Sullivan moved into the house in 1970 after they had been dispossessed of their residence. Mary Crowell believed that she was helping her son when she allowed him and his wife to move in. The plaintiffs did not move in as tenants. Philip proposed that they would be tenants. Mary Crowell, his mother, never agreed that they were tenants. Philip also stated that any payments that they made were made voluntarily. Furthermore, the plaintiffs did not have exclusive possession of any part of the house.
The evidence presented is not indicative of a landlord tenant relationship. Therefore, there is no probable cause to believe that there was an unlawful entry by the defendants.
COUNT FOUR — TREBLE DAMAGES FOR THEFT
Paragraphs #1-6 were incorporated by reference and the plaintiffs further alleged theft of a bulldozer. The plaintiffs are seeking treble damages pursuant to Conn. General Statutes 52-564. The statute provides that "any person who steals any property of another, or knowingly received and conceals stolen property shall pay the owner treble . . . damages. "Theft pursuant to Conn. General Statutes § 52-565 is synonymous with larceny under Conn. General Statutes § 53a-119."Discover Leasing, Inc. v. Murphy, 33 Conn. App. 303, 309 (1993) citingLander v. Peck, 11 Conn. App. 161, 165, 526 A.2d 539 (1987), Conn. General Statutes § 53a-119 provides [a] person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds property from an owner. Discover Leasing, Inc. v. Murphy, supra, 309.
To be awarded treble damages pursuant to Conn. General Statutes §52-564, the plaintiff must meet its burden of proof by clear and convincing evidence. The only evidence presented about the theft of the bulldozer was that the plaintiff, Philip Sullivan, had it on the premises for fifteen years, and that he last saw it in the backyard in August of 2000. The police told him that they knew who took it, but did not know where it was. The defendant, Mary Crowell, denied having any knowledge as to the whereabouts of the bulldozer. CT Page 1297-dm
The evidence is insufficient to establish probable cause that the defendant stole the bulldozer. Therefore, there is no probable cause to believe that the plaintiff would be awarded treble damages.
COUNT FIVE — CUTPA
Paragraphs #1-6 were incorporated by reference, and the plaintiffs further alleged an unfair or deceptive trade practice.
Conn. General Statutes 42-1106 (a) provides "no person shall engage in unfair methods of competition and unfair or deceptive acts of practices in the conduct of trade or commerce. To state a claim under CUTPA, the plaintiff must allege that the actions of the defendant were performed in the conduct of trade or commerce. Muniz v. Kravis, 59 Conn. App. 704,711, 757 A.2d 1207 (2000).
The plaintiffs have alleged that the defendants changed the locks, removed their possessions and threatened them with criminal prosecution for trespass by letter dated September 16, 2000. Conn. General Statutes42-110a (4) defines trade to include . . . the rent or lease . . . of any . . . property. . . . Our Supreme Court has held that a private cause of action exists under CUTPA for a violation of the statute governing landlords and tenants Muniz v. Kraus, 59 Conn. App. 704, 713 (2000) citing Lonawayh v. Prestia, 191 Conn. 484, 491, 464 A.2d 847 (1983).
In defining whether a practice violates CUTPA, we use the criteria of whether a practice offends public policy or comes within some established concept of unfairness, whether the practice is immoral, unethical, oppressive or unscrupulous or whether it causes substantive injury to consumers, competitors or other businessmen. Associated Investment Co.Ltd. Partnership v. William Associates IV, 230 Conn. 148, 155, 645 A.2d 505
(1994); Daddona v. Liberty Mobile Home Sales Inc., 209 Conn. and 243, 254, 550 A.2d 1061 (1988).
Conn. General Statutes 47a-1 (1) defines a "tenant" as a person entitled under a rental agreement to occupy a . . . premises to the exclusion of others or as is otherwise defined by law. The plaintiffs were invited to live with plaintiff's mother and they stayed for thirty years. They were told that they had to leave when the mother decided to sell her house and move to a retirement apartment. The plaintiffs were notified by letter dated July 31, 2000 that the locks would be changed shortly after August 6, 2000.
The plaintiffs left the premises July 6 or 7, 2000, and entered into a contract for their own apartment as of August 1, 2000. They were afforded opportunities to inspect and remove their personal property and they chose CT Page 1297-dn not to do so. The plaintiffs' possessions are still on the premises. The plaintiffs claim that they had been threatened in a letter, but no evidence of the letter was presented.
The plaintiffs failed to allege that the defendants' actions were performed in the conduct of trade or commerce. They merely stated that the conduct constituted unfair trade practice under CUTPA. Even if one could infer that the defendants were engaged in trade or commerce, the conduct complained of has no nexus with a public interest, no violation of a concept of what is fair, no trade practice that is immoral, unethical, oppressive or unscrupulous or offends public policy.
The conduct complained of is insufficient to support a finding of probable cause for a cause of action under CUTPA.
COUNTS SIX AND SEVEN — UNJUST ENRICHMENT AND IMPOSITION OF ACONSTRUCTIVE TRUST.
Paragraphs #1-6 were incorporated by reference. The plaintiffs further alleged that they had performed 90 percent of the labor for maintenance, improvements and repairs on the house and grounds and did not receive compensation. The plaintiffs believe that the defendants were unjustly enriched.
 A constructive trust arises contrary to intention and in invitum against one who, by fraud, actual or constructive, by duress or abuse of confidence, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal title to property which he ought not, in equity and good conscience hold or enjoy. 239 Conn. 109, 113, 680 A.2d 1314 (1996).
 The imposition of a constructive trust by equity is a remedial device designed to prevent unjust enrichment. Cohen v. Cohen, 182 Conn. 193, 203 citing 5 Scott, op. Cit. § 462.
Most of the work described at the hearing was done between 1982 and 1987. All of the work was initiated by the plaintiffs. None was requested by the defendants. The defendant, Mary Crowell, Philip's mother, paid for all the materials. The plaintiffs never requested payment or submitted a bill for their services prior to the year 2000.
On July 6, 2000, Mary Crowell moved to a retirement apartment without giving advance notice to her son Philip. The plaintiffs had discussions CT Page 1297-do with the defendants about purchasing the house, but those discussions broke down. Philip was removed as trustee in September, 2000. The application for the prejudgment remedy and the nine count complaint were filed in September, 2000.
Philip had been his mother's financial advisor. He stated that he did the work because he expected to get the house. However, in the trust documents drafted by Philip, his mother retained control over the house. The trust also provided for the house to be sold and the proceeds disbursed according to the terms. If there were any provisions concerning the house in a will, those were revoked when all wills and codicils were revoked by the trust document prepared by Philip.
Before a constructive trust can be created there must be a duty owed. No evidence was presented to show that the plaintiffs at some point held title to the property and had transferred it to the defendants. No evidence was presented to show that the defendants had a duty to transfer the property to the plaintiffs.
The work on the house and the land was done almost twenty years ago. The plaintiffs were living at the house along with the defendants. All of the residents, including the plaintiffs, would have benefited from any maintenance, repair and improvements on the house. Furthermore, the plaintiffs benefited greatly from this arrangement.
In assessing the facts and circumstances of this case, including the conduct of the parties throughout the thirty years living together, there is no probable cause to believe that the plaintiffs would prevail on their claim of unjust enrichment
COUNT EIGHT — NON-COMPLIANCE WITH STIPULATION
Paragraphs #1-6 were incorporated by reference. The plaintiffs further alleged noncompliance with the stipulation dated September 11, 2000. The plaintiffs claimed they were denied access to the garage between September 27, 2000 and October 11, 2000 in order to inspect their personal property and to assess its condition.
The plaintiffs had access to their property prior to and subsequent to September 11, 2000. The plaintiffs chose not to inspect or to remove their property. The property is still at the house available for inspection and removal. Assuming that access was denied during that two week period, the plaintiffs were not harmed because there were many other opportunities to assess whether there was any damage. There were also subsequent court orders granting the plaintiffs access to their property. CT Page 1297-dp
There is no probable cause to believe that the plaintiffs would prevail on a claim for damages as a result of not having access to their property between September 27 and October 11, 2000.
 CONCLUSION
After consideration of the legal and factual issues, and assessment of the credibility of the witnesses, the court finds that the plaintiffs failed to show the requisite probable cause to believe that a judgment would be rendered in their favor on any of the eight counts of the complaint.
Therefore, the application for the prejudgment remedy is denied.
Crawford, J